READY PAVING & CONSTRUCTION CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2324–72.  Filed March 26, 1974.

*Barry E. Semer* and *Aaron Cohen*, for petitioner.
*Lewis M. Porter, Jr.*, for respondent.

## OPINION

SCOTT, *Judge:* Respondent determined deficiencies in accumulated-earnings taxes of petitioner for the taxable years ending December 31, 1966 and 1967, in the respective amounts of $10,468.54 and $5,890.08. The only issue for decision is whether petitioner was availed of for the purpose of avoiding additional Federal income taxes with respect to its shareholders in each of the years in issue.

All the facts have been stipulated and all the stipulated facts together with the exhibits attached to the stipulation are found accordingly. We will, however, set forth herein those facts we consider helpful to an understanding of our opinion.

Petitioner is an Illinois corporation with its principal office in Chicago Ridge, Ill., at the time of the filing of the petition in this case. Petitioner filed its Federal corporate income tax returns for its taxable years ended December 31, 1966, and December 31, 1967, with the district director of internal revenue at Chicago, Ill. Its returns were filed on the completed-contract method of accounting.

Petitioner was organized in 1903 and has operated continuously since that date as a paving contractor, principally of streets and highways. Petitioner customarily performs the paving work but engages subcontractors to perform related work such as the installation of sewers, the placement of curbing, and site excavation.

Petitioner's authorized and issued capital stock consists of 750

shares of common stock having a par value of $100 per share. In 1951 petitioner reacquired 565 of its issued shares at a cost of $648,000. From that time, and throughout the years here in issue, these shares were held as Treasury stock. The remaining 185 shares continued as outstanding, and, during the years before us, were owned as follows:

| Shareholder | Number of shares (common stock—$100 par) | Percentage ownership |
|---|---|---|
| Charles H. Ready | 42 | 22. 7 |
| Robert J. Ready | 72 | 38. 9 |
| Charlotte Ready Riley | 71 | 38. 4 |
| | 185 | 100. 0 |

Petitioner's officers during the years in issue were Charles H. Ready, president; Robert J. Ready, vice president/treasurer; and Thomas Ready, secretary. Although a shareholder, Charlotte was not employed by petitioner and received no compensation from petitioner during the years in issue. Robert, Thomas, and Charlotte are the son, nephew, and daughter of Charles, respectively.

Petitioner's operating revenue (gross receipts) is derived principally from its paving contracts which it performs for both governmental bodies and private customers. The remainder of its operating revenue is derived from truck-equipment rentals and sales of material. Petitioner's books, records, and financial statements disclose, with regard to its operating revenue and the composition thereof, the extent of its subcontract work and its direct costs for the years 1963 through 1967, the following:

OPERATING REVENUE

| Year | Total | Paving and construction receipts | | |
|---|---|---|---|---|
| | | Total | Government contracts | |
| | | | Receipts | Percent of total |
| 1963 | $1,539,455 | $1,445,398 | Not known | Not known |
| 1964 | 2,102,462 | 1,993,222 | $792,959 | 40.0 |
| 1965 | ¹ 1,986,093 | 1,915,328 | 573,994 | 30.0 |
| 1966 | 1,962,177 | 1,917,312 | 568,285 | 29.6 |
| 1967 | 1,759,235 | 1,677,336 | 269,068 | 16.0 |

¹ As revised, per 1966 financial statement.

DIRECT COSTS

| Year | Total ¹ | Subcontract work | |
|---|---|---|---|
| | | Costs | Percent of total |
| 1963 | $1,222,147 | $426,066 | 34.8 |
| 1964 | 1,647,216 | 519,961 | 31.4 |
| 1965 | 1,702,533 | 448,789 | 26.3 |
| 1966 | 1,721,380 | 518,727 | 30.0 |
| 1967 | 1,500,483 | 298,976 | 19.9 |

¹ Includes direct costs of truck-equipment rentals and material sales.

Petitioner generally obtains its business through competitive bidding. It is not usually required to obtain bid and performance bonds for the work it performs for private customers. With respect to public contracts, however, petitioner must customarily submit bid bonds and qualify for a performance bond equal to the amount of the contract before its bid will be considered. The bid bond consists, in most instances, of a cash deposit which is retained by the appropriate governmental body no longer than 3 or 4 days. Usually, the bid is accompanied by a certified check amounting to 10 percent of the contract price. This check is also retained no more than 3 or 4 days, unless petitioner is the successful bidder or the second lowest bidder, in which event the check is customarily retained for 10 to 30 days until the contract is signed, at which time a performance bond is required of the successful bidder. The certified check is never negotiated. Petitioner had yearend cash deposits on bids and plans as follows:

*Dec. 31—*
```
1964 ----------------------------------------------------- $6,779.50
1965 -----------------------------------------------------  9,224.60
1966 ----------------------------------------------------- 12,910.00
1967 ----------------------------------------------------- 25,040.00
1968 -----------------------------------------------------    25.00
```

Petitioner obtains bid and performance bonds through a member of the surety industry. The surety, before underwriting the bonds, generally requires either that a contractor's net current assets equal at least 10 percent of the total work program to be undertaken, including both work in progress and the new bid, or that its net worth amount to 20 percent of this total work program provided that the contractor's reputation, experience, and business organization are adequate.

Petitioner customarily completes approximately 75 percent of its jobs in the year the job is started. Its cost data of jobs in process at yearend 1965, 1966, and 1967 were as follows:

| | Dec. 31, 1965 | Dec. 31, 1966 | Dec. 31, 1967 |
|---|---|---|---|
| Accumulated cost to end of year | $335,019.00 | $205,731.57 | $409,297.22 |
| Cost to complete | NA | 188,022.03 | 485,426.29 |
| Total cost of jobs in process | NA | 393,753.60 | 894,723.51 |

Petitioner's total billings to the end of the years 1965, 1966, and 1967 with respect to its construction jobs in process were $282,592, $214,834, and $452,055, respectively.

In 1967 petitioner bid on 340 jobs totaling $7,304,978.91 and succeeded in obtaining contracts on 133 of these bids. Total billings by petitioner for jobs it completed in 1967 amounted to $1,694,165.20. In 1968 petitioner bid on 331 jobs totaling $7,712,479.50, and succeeded in

obtaining contracts on 113 of these bids. Total billings by petitioner for jobs it completed in 1968 amounted to $2,498,677.44.

Petitioner follows a policy of billing its customers periodically over the contract period, usually every 30 days. The exception to this policy is with respect to those contracts entered into with the City of Chicago which pays only at the completion of the job. Petitioner may sometimes not pay its subcontractor until it has received payment itself on its contracts.

For the paving and construction services petitioner renders municipalities it receives payment in the form of "special assessment warrants," such warrants being the obligation of the municipality for which the contract is performed. The total face value of the warrants equals the total contract price. However, the warrants are carried on petitioner's books at figures ranging from 92 to 96 percent of their face value, representing the estimated fair market value at the time of their receipt. There is a ready market for these warrants at the discount price. Petitioner reports as income for Federal income tax purposes the fair market value of the warrants at the time of receipt. Principal collections in excess of this value are credited to income in the year such excess is received. Interest is paid on these warrants and is reflected on petitioner's books but is not included in petitioner's income as reported on its Federal income tax return since it is tax-exempt interest from municipal bonds. Petitioner has no option to elect payment in cash in lieu of warrants. As of December 31, 1965, 1966, and 1967, petitioner held special assessment warrants of a total face amount, total book value and face amount due from the City of Chicago, and book value of amount due from City of Chicago as follows:

|  | Total face amount | Total book value | Face amount of City of Chicago warrants | Book value of City of Chicago warrants |
|---|---|---|---|---|
| Dec. 31, 1965 | $741,924.72 | $682,509.16 | $93,000.40 | $78,441.48 |
| Dec. 31, 1966 | 816,748.95 | 749,001.46 | 127,015.90 | 116,606.10 |
| Dec. 31, 1967 | 873,799.02 | 802,937.30 | 243,797.40 | 227,635.61 |

The following schedule shows the new warrants received by petitioner in each of the years 1966, 1967, and 1968 and the collection of warrants through payments on principal and the amounts received from sales of warrants:

|  | New warrants received | Collections of principal by payment | Amounts received from sales of warrants |
|---|---|---|---|
| 1966 | $598,285.37 | $393,155.60 | $119,024.71 |
| 1967 | 269,068.04 | 171,640.93 | 51,465.15 |
| 1968 | 1,588,874.97 | 222,830.00 | 1,077,304.89 |

Comparative abbreviated balance sheets and income statements as shown on petitioner's books for the years 1965, 1966 (as revised per 1967 financial statement to show a $20,000 contribution to profit-sharing trust), and 1967 are as follows (rounded to nearest dollar):

### BALANCE SHEETS AT DECEMBER 31

| | 1965 | 1966 | 1967 |
|---|---|---|---|
| *Assets* | | | |
| Current assets: | | | |
| Cash | $14,080 | $52,247 | $33,370 |
| Accounts receivable | 426,165 | 497,001 | 662,075 |
| Special assessment warrants | 682,509 | 749,001 | 802,937 |
| Construction jobs in process | 52,427 | | |
| Prepaid insurance | 9,037 | 7,107 | 2,237 |
| Total current assets | 1,184,218 | 1,305,357 | 1,500,619 |
| Municipal improvement bonds | 10,000 | 10,000 | 10,000 |
| Corporate stock (Ready Asphalt Co.) | 30,004 | 30,004 | 30,004 |
| Long-term contract receivable | 51,074 | 44,475 | 37,541 |
| Cash surrender value life insurance [1] | 31,714 | 45,520 | 60,414 |
| Transportation deposit | 425 | 425 | 425 |
| Fixed assets (net) | 350,433 | 327,733 | 347,157 |
| Total assets | 1,657,868 | 1,763,514 | 1,986,161 |
| *Liabilities* | | | |
| Current liabilities: | | | |
| Notes payable | | 100,000 | 125,000 |
| Accounts payable | 358,206 | 320,784 | 445,054 |
| Accrued taxes and expenses | 103,979 | 103,533 | 109,047 |
| Profit-sharing trust contribution | | 20,000 | 20,000 |
| Advance billings on construction jobs in process | | 9,102 | 42,758 |
| Provision for Federal income taxes | 36,217 | 8,295 | 6,750 |
| Total current liabilities | 498,402 | 561,715 | 748,608 |
| Deferred capital gain | 52,156 | 46,449 | 40,450 |
| Capital stock | 75,000 | 75,000 | 75,000 |
| Earned surplus (net of treasury stock) | 1,032,310 | 1,080,350 | 1,122,102 |
| Total liabilities and capital | 1,657,868 | 1,763,514 | 1,986,161 |

[1] This figure represents premiums paid by petitioner on policies on lives of two of its officers which indebtedness is partially secured by the cash value of the policies.

### INCOME STATEMENTS

| | 1965 | 1966 | 1967 |
|---|---|---|---|
| Operating revenue | $1,986,093 | $1,962,177 | $1,759,235 |
| Direct costs | 1,702,533 | 1,721,380 | 1,500,483 |
| Gross profit | 283,560 | 240,797 | 258,752 |
| Promotion and administrative expense | 206,760 | 207,125 | 221,743 |
| Net profit—operations | 76,800 | 33,672 | 37,009 |
| Other income—net of interest | 39,841 | 42,663 | 31,493 |
| Net profit—precontribution to profit-sharing trust | 116,641 | 76,335 | 68,502 |
| Contribution to profit-sharing trust | | 20,000 | 20,000 |
| Net profit—pretax | 116,641 | 56,335 | 48,502 |
| Federal income tax | 36,217 | 8,295 | 6,750 |
| Net profit to surplus | 80,424 | 48,040 | 41,752 |

The following schedule reflects petitioner's earned surplus as of December 31 for the years 1963 through 1967 and the increase thereof during each year:

| Year | Earned surplus Dec. 31 | Increase (decrease) |
|------|------------------------|---------------------|
| 1963 | $869, 591. 49 | $82, 295. 07 |
| 1964 | 951, 886. 56 | 80, 423. 43 |
| 1965 | 1, 032, 309. 99 | 58, 920. 23 |
| 1966 | 1, 080, 350. 22 | 41, 752. 27 |
| 1967 | 1, 122, 102. 49 | 29, 095. 92 |

Petitioner's fixed-asset purchases in the years 1964 through 1968 and its deductions allowed for depreciation in those years, were as follows (rounded to nearest dollar):

| Year | Fixed-asset purchases | Depreciation claimed |
|------|-----------------------|----------------------|
| 1964 | $65, 875 | $48, 641 |
| 1965 | 48, 731 | 47, 600 |
| 1966 | 25, 845 | 45, 843 |
| 1967 | 66, 736 | 44, 571 |
| 1968 | 126, 684 | 59, 439 |

For the years 1967 and 1968, petitioner's total number of jobs bid and aggregate amount of those bids, and the number of those which were governmental bids and the aggregate amount of the bids on jobs for governmental bodies per month are as follows:

| Year | Bids | Aggregate amount [1] | Bids on governmental contracts [2] | Aggregate amount [1] |
|------|------|----------------------|-------------------------------------|----------------------|
| *1967* | | | | |
| January | 12 | $601, 534 | None | 0 |
| February | 20 | 320, 805 | 1 | $47, 765 |
| March | 21 | 188, 312 | None | 0 |
| April | 47 | 1, 225, 970 | 7 | 764, 691 |
| May | 51 | 891, 068 | 4 | 80, 600 |
| June | 42 | 878, 222 | 6 | 152, 138 |
| July | 33 | 1, 022, 657 | 5 | 684, 004 |
| August | 28 | 317, 921 | 2 | 165, 873 |
| September | 34 | 671, 532 | 6 | 308, 862 |
| October | 31 | 722, 195 | 3 | 320, 343 |
| November | 11 | 280, 887 | None | 0 |
| December | 8 | 228, 044 | 1 | 174, 106 |
| | [3] 338 | [4] 7, 344, 147 | 35 | 2, 698, 382 |
| *1968* | | | | |
| January | 8 | 199, 099 | None | 0 |
| February | 23 | 258, 189 | None | 0 |
| March | 39 | 816, 006 | 5 | 231, 438 |
| April | 43 | 443, 752 | 5 | 38, 445 |
| May | 32 | 2, 445, 078 | 7 | 2, 043, 245 |
| June | 14 | 573, 176 | 1 | 28, 857 |
| July | 44 | 841, 221 | 4 | 307, 803 |
| August | 22 | 567, 788 | 4 | 406, 296 |
| September | 33 | 427, 930 | 3 | 131, 903 |
| October | 25 | 603, 232 | None | 0 |
| November | 29 | 467, 618 | None | 0 |
| December | 12 | 210, 473 | None | 0 |
| | [3] 324 | [4] 7, 853, 562 | 29 | 3, 187, 987 |

[1] Where two amounts appeared on the stipulated exhibit opposite a particular job, the higher amount only is included in the monthly total.

[2] Governmental bodies include the Chicago Board of Local Improvements, several villages and cities, a park district, several school districts, and those schools listed as public schools in the South Suburban Chicago telephone directory published by the Illinois Telephone Co. for 1971–72, and the State of Illinois.

[3] Jobs based on unit prices, or the amounts of which were undisclosed are not included.

[4] Although the parties stipulated that petitioner bid on jobs totaling $7,304,978.91 in 1967 and $7,712,479.50 in 1968, the totals of the amounts appearing on submitted bid sheets describing each of the jobs bid by petitioner in 1967 and 1968, and as shown above, are different.

The largest aggregate daily bid submitted by petitioner in 1967 was on April 14 for $804,473, of which amount $764,691 was for bids on governmental contracts. The largest aggregate daily bid submitted by petitioner in 1968 was on May 9 for $1,321,450, of which amount $1,288,-398 was for bids on governmental contracts.

Petitioner's operating costs, exclusive of depreciation, and its cost of goods sold for 1966 and 1967 were as follows:

| Year | Operating costs | Cost of goods sold | Total |
|---|---|---|---|
| 1966 | $491,904 | $1,404,340 | $1,896,244 |
| 1967 | 556,883 | 1,139,572 | 1,696,455 |

The following schedule shows an analysis of petitioner's trade accounts receivable as of December 31, 1965, 1966, and 1967, by date of billing:

| | Dec. 31, 1965 | | Dec. 31, 1966 | | Dec. 31, 1967 | |
|---|---|---|---|---|---|---|
| | Amount | Percent | Amount | Percent | Amount | Percent |
| 30 days or less | $229,541.60 | 56.6 | $127,317.11 | 26.9 | $371,846.03 | 62.9 |
| 30 to 60 days | 68,557.76 | 16.9 | 189,667.15 | 40.1 | 85,589.96 | 14.5 |
| 60 to 90 days | 56,669.77 | 14.0 | 70,408.46 | 14.9 | 95,918.90 | 16.2 |
| Over 90 days | 50,767.33 | 12.5 | 85,880.68 | 18.1 | 37,899.43 | 6.4 |
| Totals | 405,536.46 | 100.0 | 473,273.40 | 100.0 | [1] 591,254.32 | 100.0 |

[1] No explanation is given in the financial statement as to the discrepancy between this amount and the balance sheet amount.

By the date of preparation of petitioner's audit reports for the years 1965, 1966, and 1967, on February 4, 1966, March 8, 1967, and March 5, 1968, respectively, collections on the yearend trade accounts of $181-686.71 for the 1965 accounts, $380,622.08 for the 1966 accounts, and $363,163.45 for the 1967 accounts had been made.

Petitioner's shareholders together with their respective spouses filed joint income tax returns reporting taxable income and income tax for the years 1966 and 1967 as follows:

| Shareholders | 1966 | 1967 |
|---|---|---|
| Charles H. and Marie Ready | | |
| Taxable income | $51,574.43 | $42,552.80 |
| Tax | 17,847.22 | 13,365.34 |
| Robert J. and Rita J. Ready | | |
| Taxable income | 49,121.00 | 41,012.00 |
| Tax | 16,621.00 | 12,626.00 |
| William J. and Charlotte R. Riley | | |
| Taxable income | 93,587.17 | 96,216.73 |
| Tax | 41,332.30 | 42,910.04 |

From 1960, and prior to 1969, the only dividends declared and paid by petitioner were declared on December 27, 1968, in the total amount of $5,550, or $30 per share.

Prior to mailing to petitioner a statutory notice of deficiency, respondent, pursuant to section 534(b), I.R.C. 1954,[1] notified petitioner of his proposal to issue a statutory notice of deficiency for the years 1966 and 1967 with respect to the accumulated-earnings tax imposed by section 531. On October 4, 1971, petitioner, pursuant to section 534(c), timely filed its statement of alleged grounds upon which it relies to establish that its earnings and profits were not permitted to accumulate beyond the reasonable needs of its business.

Thereafter on January 12, 1972, respondent issued a statutory notice of deficiency to petitioner in which he determined deficiencies of $10,468.54 and $5,890.08 for petitioner's taxable years ended December 31, 1966 and 1967, respectively.

Section 531 [2] imposes an accumulated-earnings tax on those corporations described in section 532,[3] formed or availed of for the purpose of avoiding income taxes on their shareholders by allowing earnings and profits to accumulate rather than being divided or distributed. Section 533 [4] provides that the fact that earnings and profits are accumulated beyond the reasonable needs of the business, including the reasonably anticipated needs of such business as provided in section 537,[5] is determinative of the purpose to avoid income tax unless the petitioner can prove otherwise by a preponderance of the evidence.

Section 534 [6] permits the petitioner to shift the burden of proof regarding the reasonable needs of its business to respondent by filing a statement setting forth grounds and facts to support such grounds

---

[1] All statutory references are to the Internal Revenue Code of 1954.

[2] SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX.

In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of—
   (1) 27½ percent of the accumulated taxable income not in excess of $100,000, * * *

[3] SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * formed or availed of for the purpose of avoiding the income tax with respect to its shareholders * * * by permitting earnings and profits to accumulate instead of being divided or distributed.

[4] SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.

(a) UNREASONABLE ACCUMULATION DETERMINATIVE OF PURPOSE.—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

[5] SEC. 537. REASONABLE NEEDS OF THE BUSINESS.

(a) GENERAL RULE.—For purposes of this part, the term "reasonable needs of the business" includes—
   (1) the reasonably anticipated needs of the business,

[6] Sec. 1.534–2(d), Income Tax Regs., provides as follows:

Sec. 1.534–2(d). *Statement by taxpayer.* (1) A taxpayer * * * may, under section 534(c), submit a statement that all or any part of the earnings and profits of the corporation have not been permitted to accumulate beyond the reasonable needs of the business. Such statement shall set forth the ground or grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that there has been no accumulation of earnings and profits beyond the reasonable needs of the business. * * *

sufficiently substantial, as well as sufficiently clear and definite, to show that its earnings were not permitted to accumulate beyond the reasonable needs of its business.

Although petitioner filed a statement in accordance with the provisions of section 534, at the trial its counsel stated that no ruling with respect to whether this statement was sufficient to shift the burden of proof in whole or in part with respect to the amount of the accumulated earnings necessary to meet the reasonable needs of its business need be made since the stipulated facts presented all evidence necessary to determine that issue on its merit.

Each of the parties discusses the items to be included in petitioner's assets available for working capital or for dividends as well as the amount petitioner needs for working capital, including the working capital requirement made by the surety company to furnish bonds for petitioner, and for its acquisition of fixed assets.

The parties both recognize that petitioners current liabilities which are shown on its balance sheets as $561,715 for 1966 and $748,608 for 1967 must be subtracted from petitioner's current assets to arrive at the amount of petitioner's current assets available for use as working capital, other necessary business purposes of petitioner, and the payment of dividends.

Respondent takes the position that petitioner's available assets consist of all of the amounts shown for these years on its balance sheets as current assets, namely, cash, accounts receivable, special assessment warrants, and prepaid insurance plus the $10,000 petitioner held in municipal improvement bonds and the cash surrender value of life insurance that petitioner had on the lives of its officers.

Petitioner takes the position that its only current assets consisted of its cash, accounts receivable, and prepaid insurance. In this manner petitioner shows current assets as of the end of 1966 of $556,355, and current assets as of the end of 1967 of $697,682 from which it subtracts current liabilities of $550,835 and $748,608,[7] respectively. By use of these figures petitioner arrives at a figure of net current assets of $5,520 for 1966 and a deficiency in current assets as of the end of 1967 of $50,926.

If petitioner improperly excluded its special assessment warrants from its current assets and improperly used the figure of $550,835 instead of $561,715 as its current liabilities at the end of 1966, the figures show that petitioner had $743,642 of net liquid assets as of the end of 1966 and $752,011 as of the end of 1967 without the inclusion of munic-

---

[7] Petitioner's balance sheets show current liabilities as of the end of 1966 at $561,715 and as of the end of 1967 of $748,608. While petitioner's figure for 1967 is exactly the same as its balance sheet figure, its figure for 1966 is $10,880 less than the current liabilities as shown on its balance sheet. Petitioner does not explain what it considers improperly a current liability on its balance sheet figures to cause this reduction.

ipal bonds and the cash surrender value of the life insurance policies in its current assets.

Petitioner not only contends that the special assessment warrants should not be considered as net current assets but also contends that these warrants should be considered as accounts receivable in computing the amount it needs for working capital.[8]

Petitioner, by contending that a formula approach should be taken to determine its need for accumulated earnings for working capital and that in this formula accounts receivable should include its special

---

[8] Both petitioner and respondent compute an amount that they consider to be petitioner's justifiable accumulation for working capital on what each refers to as the "Bardahl" formula (*Bardahl Manufacturing Corp.*, T. C. Memo. 1965–200).The following is petitioner's computation :

Petitioner's accounts payable and relevant operating liabilities needed to compute petitioner's operating cycle are :

|  | Dec. 31, | | |
|---|---|---|---|
|  | 1965 | 1966 | 1967 |
| Accounts payable | $358,206 | $320,784 | $445,054 |
| Accrued taxes and expenses | 103,979 | 103,533 | 109,047 |
| Profit-sharing trust contribution | 0 | 0 | 20,000 |
| Totals | 462,185 | 424,317 | 574,101 |

Petitioner's inventory cycle in days is:

|  | Calendar year | |
|---|---|---|
|  | 1966 | 1967 |
| Cost of goods sold | $1,404,340 | $1,139,572 |
| Average inventory | $21,663 | ($25,930) |
| Inventory turnover in times per year—cost of goods sold divided by average inventory | 64.8 | (43.9) |
| Number of days over which inventory turns over—365 divided by 64.8 and (43.9) | 5.6 | (8.3) |

Petitioner's receivables cycle in days (computed by including special assessment warrants as long-term receivables) is:

|  | Calendar year | |
|---|---|---|
|  | 1966 | 1967 |
| Total sales | $1,962,177 | $1,759,235 |
| Average accounts receivable based upon the following balances: | | |
| 12/31/65 $1,088,046 | | |
| 12/31/66 1,222,275 | | |
| 12/31/67 1,431,683 | $1,155,161 | $1,326,979 |
| Receivables turnover in times per year—sales divided by average receivables | 1.7 | 1.3 |
| Number of days over which receivables turn over—365 divided by 1.7 and 1.3 | 214.7 | 280.8 |

Petitioner's credit cycle in days is:

|  | Calendar year | |
|---|---|---|
|  | 1966 | 1967 |
| Cost of sales and operating expenses—net of depreciation | $1,896,244 | $1,696,455 |
| Average accounts payable and accrued expenses based upon the following balances: | | |
| 12/31/65 $462,185 | | |
| 12/31/66 424,317 | | |
| 12/31/67 574,101 | $443,251 | $499,209 |

assessment warrants, arrives at a needed accumulation for working capital of $703,506 for 1966 and $768,494 for 1967 as compared to its contention that it only had available net current assets of $5,520 for 1966 and had a deficiency in net current assets of $50,926 for 1967.

Respondent not only contends that petitioner's special assessment warrants are current assets available for use by petitioner as working capital or for payment of dividends or for any other business purpose of petitioner, but using a formula approach, arrives at the conclusion that petitioner had a "zero" working capital need at the end of each of the years 1966 and 1967.[9]

| | Calendar year | |
| --- | --- | --- |
| | 1966 | 1967 |
| Average credit period as a percent of a year—average payables divided by costs and operating expenses net of depreciation | 23.3% | 29.4% |
| Average credit period in days—365 times 23.3% and 29.4% | 85.0 | 107.3 |

Petitioner's operating cycle is therefore:

| | Calendar year | |
| --- | --- | --- |
| | 1966 | 1967 |
| Inventory cycle—days | 5.6 | (8.3) |
| Receivables cycle—days | 214.7 | 280.8 |
| | 220.3 | 272.5 |
| Less: Credit cycle—days | 85.0 | 107.3 |
| Operating cycle—days | 135.3 | 165.2 |
| Operating cycle—percentage of a year—135.3 and 165.2 divided by 365 | 37.1% | 45.3% |

Accordingly, petitioner had need to accumulate current assets for working capital, as follows:

| Year ended Dec. 31— | Costs and expenses | Operating cycle, percent | Justifiable accumulation |
| --- | --- | --- | --- |
| 1966 | $1,896,244 | 37.1 | $703,506 |
| 1967 | 1,696,455 | 45.3 | 768,494 |

[9] Respondent, using the so-called "Bardahl" formula (*Bardahl Manufacturing Corp.,* T. C. Memo. 1965–200), arrived at his computation of zero working capital need as follows:

| | 1966 | 1967 |
| --- | --- | --- |
| Average construction jobs in-process (accumulated costs net of billings) | $21,663 | ($25,930) |
| Cost of goods sold | $1,404,340 | $1,139,572 |
| Construction jobs in-process turnover | 64.83 times | 43.95 times |
| Operating cycle [1] | 5.63 days | (8.30) days |
| Average trade accounts receivable | $439,405 | $551,010 |
| Operating revenue | $1,962,177 | $1,759,235 |
| Receivables turnover | 4.47 times | 3.19 times |
| Operating cycle [1] | 81.66 days | 114.42 days |
| Average accounts payable [2] | $493,251 | $601,709 |
| Operating expenses plus cost of goods sold (as below) | $1,874,365 | $1,674,568 |
| Payables turnover | 3.80 times | 2.78 times |
| Operating cycle [1] | (96.05) days | (131.29) days |
| Total operating cycle [1] | 0 days | 0 days |
| Cost of goods sold (as above) | $1,404,340 | $1,139,572 |
| Operating expenses [3] | 470,025 | 534,966 |
| Total expenses | $1,874,365 | $1,674,568 |
| Operating cycle percent of 1 year | 0.00 percent | 0.00 percent |
| Working capital needs | 0 | 0 |

[1] Based on a 365-day year.
[2] Includes notes payable, accounts payable, and accrued taxes and expenses from balance sheets.
[3] Total deductions claimed on line 27 of petitioner's Federal income tax returns, less depreciation, contributions, and profit-sharing trust contributions.

Respondent, while arriving on a formula approach at a zero need of petitioner for working capital, recognizes that in fact petitioner did need some working capital and that some working capital would be necessary to enable petitioner to obtain the needed performance bonds. Respondent estimates the amount of petitioner's working capital needs for the purpose of maintaining its ability to obtain performance bonds from its surety at a maximum of $226,000 in 1966 and $333,000 in 1967.

Petitioner does not contend in its brief that any additional working capital over that computed by its "formula" is needed to obtain performance bonds. Both parties apparently consider the need for working capital by petitioner for purposes of its normal operations and its need for capital to be able to procure performance bonds to be in effect overlapping.

Both parties recognize that in addition to working capital, petitioner needed amounts for its bid bonds, which need petitioner estimates at $39,376 for 1966 and $89,472 for 1967 and respondent estimates at $130,000 for each of the years 1966 and 1967. Both parties also recognize that petitioner had need for some capital in each year to add to its fixed assets.

Respondent contends that it had need only for approximately $15,000 in each of these years since any other amount of additions to petitioner's assets could be obtained through use of the amount it deducted as depreciation on its assets. Petitioner recognizes that some adjustment should be made because of the availability of the amount it deducts as depreciation for use in replacing its fixed assets, but contends that it had need in each year of $50,398 in addition to its depreciation deduction since its fixed assets account was growing and the cost of equipment increasing over the cost of its original equipment which was being depreciated.

It is readily apparent that it is unnecessary to resolve the minor issues between the parties. If we use a need of petitioner for $130,000 of retained earnings for bid bonds which is more than claimed by petitioner, and $50,398 for acquiring fixed assets which is the amount it claims as of the end of each year, and consider $450,000 to be its need each year for working capital including amounts of working capital to cover performance bonds as of the end of each of these years, the net amount of needed accumulation by petitioner at the end of each year is $630,398 which is more than $100,000 less than its available net current assets at the end of each year if petitioner's special assessment warrants are considered current assets. Unless we approve petitioner's contention that its special assessment warrants should be considered as long-term accounts receivable which should be included in its accounts receivable in determining its working capital needs for one "operating cycle," petitioner has grossly overstated its need

for working capital even on the basis of the formula it uses to compute its working capital need. If we compute a working capital need for petitioner following its formula in every respect, except eliminating from its accounts receivable its special assessment warrants, the result is a working capital need of $11,376 for 1966 and zero for 1967.[10]

We see no justification for considering petitioner's special assessment warrants as accounts receivable. The parties have stipulated that for "the paving and construction services petitioner renders municipalities it receives payment in the form of special assessment warrants." When petitioner has been paid, even though that payment is in a form of property other than cash, it no longer has an account receivable. Since these warrants are stipulated by the parties to be given to petitioner in payment for its services, they do not represent accounts receivable. After petitioner receives these warrants, it no longer has accounts receivable for its services. However, the fact that the formula used by petitioner corrected as to accounts receivables results in petitioner's needing practically no working capital does not cause us to conclude that this is a fact. Considering the facts in this record including—(1) that petitioner's practice is to bill its customers prior to completion of the work it does for them and receive payment for its work generally at about 30- to 60-day intervals, (2) that petitioner has no inventories except its work in progress which generally is billed for shortly after it is done, and (3) that in many instances petitioner does not pay its accounts payable such as accounts payable to subcontractors until after it has been paid by the person for whom the work is being done—we conclude that petitioner's need for working capital is for sufficient capital to carry its operations for about 45 days. Expressed in the form of percentage as the parties do, this would be 12.33 percent. Applying this percentage to petitioner's costs and expenses results in

---

[10] If the warrants are eliminated from petitioner's receivables turnover, its number of days for receivables turnover would be the same as that computed by respondent, namely, 81.66 in 1966 and 114.42 in 1967. Following every other item as used by petitioner results in the following:

|  | 1966 | 1967 |
|---|---|---|
| Inventory cycle—days | 5.6 | (8.3) |
| Receivables cycle—days | 81.66 | 114.42 |
|  | 87.26 | 106.12 |
| Less: |  |  |
| Credit cycle—days | 85.0 | 107.3 |
| Operating cycle—days | 2.26 | (1.22) |
| Operating cycle—percentage of a year—2.26 and (1.22) divided by 365 | 0.60% | 0% |

| Year ended Dec. 31— | Costs and expenses | Operating cycle, percent | Justifiable accumulation |
|---|---|---|---|
| 1966 | $1,896,244 | 0.60 | $11,376 |
| 1967 | 1,696,455 | 0 | 0 |

$233,806 for 1966 and $209,172 for 1967. If these amounts should be somewhat increased in recognition of the fact that petitioner needs to have available as working capital in order to procure for its Government work performance bonds, approximately 10 percent of its total work undertaken at the time the performance bond is given and its need for a bond might arise at its low point of working capital, we arrive at a maximum of $450,000 of working capital need for petitioner in each year.

After analyzing this case, in our view, the only real issue is whether or not petitioner's special assessment warrants should be considered as current assets available for working capital and other business needs of petitioner and for the payment of dividends. In fact each of the parties, in their briefs, likewise recognize this as the determinative issue. In fact petitioner on brief stated it as the only question presented even though it argues other points in its briefs. If this issue is decided in accordance with respondent's contention, clearly petitioner has accumulated earnings at the end of each year here in issue well in excess of any reasonable needs of its business. If it is determined as petitioner contends, it is clear that it did not.

Respondent points out in support of his position (1) that petitioner's accountants in their audit statement in fact included the special assessment warrants in petitioner's current asset account; (2) that since petitioner would not have been able to meet the qualification of performance bonds if these warrants had not been considered by the surety company as current assets, in fact petitioner did treat the warrants as current assets; and (3) that the warrants were readily marketable and petitioner did in fact sell warrants in each of the years.

Petitioner argues that it is not bound by its accountant's inclusion of the warrants as current assets, that under accepted accounting principles the warrants should not have been so included, and that in fact the warrants are nothing except accounts receivable in the form of a governmental obligation. Petitioner contends that the warrants should be treated as long-term receivables and not as current assets in determining its available liquid assets from which it could pay dividends. Petitioner further argues that since it has no choice except to take the warrants for its work for various municipalities, it can only receive payment in full for its jobs for these municipalities by holding the warrants until their maturity.

None of the quotations from accounting authorities cited by petitioner in support of its position deals with warrants of a municipality nor with situations comparable to petitioner's. Petitioner bids for jobs knowing that it will receive warrants and be in a position to sell the warrants it receives at a discount of from 4 to 8 percent or to hold

the bonds until maturity collecting tax-free interest thereon. It is a fair inference that these facts are considered by petitioner in placing its bids. The principal of the bonds is paid periodically as the municipality collects from the persons against whom it has made a special assessment for the work done.

From the facts here present, we conclude that the special assessment warrants are current assets available for payment of dividends by petitioner. In reaching this conclusion we have considered the fact that these warrants are received by petitioner in payment for the performance of its ordinary work, that they are readily marketable, and that in fact some of them were sold by petitioner in each of the years here in issue. We have also considered the fact that if petitioner sells only those warrants it needs to sell for funds for the day-to-day operation of its business and accumulates through the years the balance of the warrants and considers them not to be current assets, in theory it would be possible for petitioner to continuously and indefinitely increase its accumulated earnings and profits without paying any dividend or being subject to tax under section 531. Petitioner would thereby be afforded a readymade method of avoiding imposition of tax upon its shareholders by operating from its cash collections and warrant payments first and from necessary warrant sales for operations thereafter but never paying a dividend irrespective of how great its otherwise unused warrant investment grew.

There is nothing in this record to indicate that petitioner could not have distributed the special assessment warrants themselves as dividends to its shareholders had it not wanted to sell them to distribute cash dividends. See *Nemours Corporation*, 38 T.C. 585, 602–603 (1962), affirmed per curiam 325 F.2d 559 (C.A. 3, 1963).

While our attention has been directed to no case dealing with whether warrants received by a taxpayer in payment for services are current assets available for distribution as dividends, we have in many cases held Federal Government bonds, other Federal and State obligations, and stocks and bonds of private corporations to be current assets. See *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495, 504 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court, in which United States and State obligations were considered current assets; *Dielectric Materials Co.*, 57 T.C. 587, 595 (1972), in which United States Treasury notes were considered current assets; and *Bremerton Sun Publishing Co.*, 44 T.C. 566, 578, 587 (1965), in which United States Government bonds were considered current assets but stock of other corporations which the taxpayer was required to have to insure an adequate material supply or fund a profit-sharing trust was not. We have held that such securities should be included in

computing the current assets of the taxpayer at their market value. *Golconda Mining Corp.*, 58 T.C. 736 (1972), on appeal (C.A. 9, Nov. 15, 1972). Petitioner included the special assessment warrants in reporting its income at their market value and we have included them at their market value in computing petitioner's current assets.

The special assessment warrants, although acquired by petitioner in connection with its work, did not, after they were acquired, have any relationship to petitioner's business and were completely subject to use by petitioner as it saw fit. These warrants were not comparable to stock in a related company that a taxpayer needed to keep in order to obtain supplies or have an outlet for sale of its products. Cf. *Bremerton Sun Publishing Co., supra.* Insofar as the record shows, it was immaterial to the municipalities for which petitioner did work whether petitioner kept the warrants, sold them, or distributed them as dividends. These warrants were nothing but readily marketable assets comparable to the marketable assets we have considered in many cases to be current assets. We see no reason why the readily marketable assets should be treated differently in petitioner's hands because it acquired them for services than they would be treated in the hands of another company which purchased them from petitioner.

Considering the evidence here as a whole we conclude that petitioner's special assessment warrants were current assets. We further conclude that there was no business reason for petitioner's retaining these warrants, and as previously pointed out, that petitioner's net liquid assets were in excess by over $100,000 of any reasonable needs of its business in each of the years here in issue.

Since petitioner permitted its earnings to accumulate beyond the reasonable needs of its business, the presumption is that the accumulation was for the purpose of avoiding the surtax on its shareholders which causes petitioner to be subject to tax under section 531. *Pelton Steel Casting Co.* v. *Commissioner*, 251 F. 2d 278 (C.A. 7, 1958), affirming 28 T.C. 153 (1957). We therefore sustain respondent's determination of the accumulated-earnings tax against petitioner for each of the years in issue.

*Decision will be entered for the respondent.*