FEILEN MEAT CO., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feilen Meat Co. v. Commissioner
Docket No. 6375-82.
United States Tax Court
T.C. Memo 1984-341; 1984 Tax Ct. Memo LEXIS 332; 48 T.C.M. (CCH) 440; T.C.M. (RIA) 84341; July 5, 1984. Paul M. Thielking, for the petitioner. Genelle F. Schlichting, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Taxable Year Ending
Deficiency
April 30, 1977
$31,403.06
Oct. 31, 1977 (short taxable year) [1]
26,571.65
*334 The sole issue for decision is whether petitioner was availed of for the purpose of avoiding the imposition of income tax on its shareholders by permitting its earnings and profits to accumulate beyond the reasonable needs of its business. FINDINGS OF FACT Petitioner, Feilen Meat Co. (hereinafter referred to as petitioner or the corporation), was organized in October 1964 under the laws of the State of Iowa. Petitioner's principal place of business was Des Moines, Iowa, at the time it filed its petition herein. Petitioner filed its United States Corporate tax returns (Forms 1120) for the taxable year ending April 30, 1977, and short taxable year ending October 31, 1977, with the Internal Revenue Service Center, Kansas City, Missouri. At all times relevant, Harvey H. Feilen (hereinafter Harvey) was the principal shareholder of petitioner and he served as its president since the date of its incorporation. [2] During the years in issue the outstanding common stock of petitioner was held as follows: FY 4/30/77
FY 10/31/77
Shareholder
No. Shares
Percent
No. Shares
Percent
Harvey H. Feilen
100.39
66.93%
134.89
90%
Virgil Clark
45   30.00%
0   0 Employee Stock
4.61
3.07%
15.11
10%
150   100%
150   100%
*335 *336 Petitioner is a wholesale distributor of meat products. It purchases all the meat products it distributes from its sister corporation, Harvey Feilen Provision Co. (hereinafter Provision). Provision purchased the animal carcasses, butchered and packaged the meat, and sold its entire production to petitioner. Throughout the years in issue, Harvey was Provision's sole shareholder and president. Although petitioner and Provision operated their respective businesses out of the same building and shared several employees, each corporation paid the employees separately. In all other respects, however, Harvey organized and operated petitioner and Provision as separate corporations. Prior to October 31, 1977, petitioner's fiscal year ended April 30 while Provision's fiscal year ended October 31. Provision, unlike petitioner, elected to pay taxes as a Subchapter S corporation under sections 1371, [3] et seq. Provision and petitioner maintained separate checking accounts, separate payroll accounts, and separate books and records. In addition, each corporation filed separate tax returns, and maintained intercompany accounts receivable and accounts payable for the sale of goods by Provision *337 to petitioner. At all relevant times, R & N Garage Company (hereinafter R & N) was a corporation organized to own and operate a garage which was rented to petitioner. Harvey's wife, Ruby Feilen, and Harvey's son, Nick Feilen (hereinafter Nick), owned all the outstanding stock of R & N. Harvey and his wife, Ruby, filed joint Federal income tax returns for the 1976 and 1977 taxable years. On those returns, they reported taxable income in the amounts of $230,783.91 and $232,652.70, respectively, which placed them in the 70 percent tax bracket. Harvey received the following amounts as compensation from petitioner and Provision in 1976 and 1977: Compensation
Compensation
Year
From Petitioner
From Provision
Total
1976
$ 30,000
$110,000
$140,000
1977
130,000
10,000
140,000
Petitioner and Provision reported taxable income *338 in the following amounts during their respective fiscal years ending in 1976 and 1977: Petitioner's
Provision's
FY Ending
Taxable Income
Taxable Income
4/30/76
$111,361.48
10/31/76
$120,445.58
4/30/77
184,708.70
10/31/77
122,848.73 (6 mos.)
94,472.29 (12 mos.)
The following chart shows petitioner's pre-tax net earnings, after-tax net earnings, retained earnings, the increase in retained earnings, and the dividends paid according to petitioner's books and records for the fiscal years ending April 30, 1965 through the short fiscal year ending October 31, 1977: Increase
Year
Pre-Tax
After-Tax
in Retained
Retained
Dividends
Ending
Net Earnings
Net Earnings
Earnings
Earnings
Paid
4/30/65
$ 22,923.67
$17,463.41
$ 0
$ 17,013.41
0
4/30/66
48,666.67
31,132.19
30,232.26
47,245.67
0
4/30/67
90,733.19
52,568.26
51,676.90
98,922.57
0
4/30/68
82,648.99
47,673.39
47,982.28
146,904.85
0
4/30/69
90,061.45
44,132.93
43,232.93
190,137.78
0
4/30/70
114,081.17
52,159.17
51,259.17
241,396.95
0
4/30/71
137,593.09
67,402.26
66,502.26
307,899.21
0
4/30/72
116,429.41
58,728.68
57,472.28
365,371.49
1,500.00
4/30/73
122,690.11
61,508.98
60,008.98
425,380.47
1,500.00
4/30/74
149,083.85
76,537.91
75,143.07
500,523.54
1,500.00
4/30/75
197,700.09
95,496.78
102,584.49
603,108.03
1,500.00
4/30/76
100,355.83
53,654.29
53,654.29
656,762.32
0
4/30/77
189,063.17
95,979.95
107,926.46
764,688.78
0
10/31/77
127,174.19
72,891.20
72,891.20
837,579.98
0
*339 The following chart illustrates petitioner's financial status for its fiscal years ending April 30, 1977 (12 months) and October 31, 1977 (6 months): Fiscal Year
Fiscal Year
Ending 4/30/77
Ending 10/31/77
Net Sales
$13,810,896.41
$7,760,292.96
Cost of Goods Sold
13,001,295.48
6,838,036.94
Net Operating Expenses
677,746.78
838,373.77
Average Net Trade Accounts Receivable
447,408.43
499,922.83
Average Trade Inventory
12,795.63
13,517.59
Average Trade Accounts Payable [4]
11,835.29
15,186.22
Petitioner maintained good credit with its suppliers and was generally extended 7 day credit on its accounts payable. Petitioner paid its payables (including payables to Provision) within the 7 day period. Petitioner's balance sheets as of the end of each year in issue were as follows: FY 4/30/77
FY 10/31/77
Assets
Cash
$188,968.85 $259,921.90 Accounts Receivable
527,852.50 494,071.84 Inventories
34,191.27 25,922.65 Interest Receivables
910.92 Government Obligations
50,000.00 Bond Premium
3,036.13 Loan to Boxing
28,976.63 28,976.63 Investment in Boxing
6,000.00 6,000.00 Prepaid Items
15,357.25 3,157.50 Travel Advance
1,050.00 Loans to Shareholder
120.00 120.00 Note Receivable
9,830.47 9,462.68 Cash Surrender Value
70,018.70 74,714.02 (Life insurance)
(71,516,24)
(71,516.24)
Less paid Loan
ESOP
5.00 Loan to R & N
3,804.15 3,425.94 Fixed Assets (Net)
51,742.01 64,329.17 Total Assets
$865,350.59 $953,583.14 Liabilities
Accounts Payable
20,142.49 50,639.32 Payable to ESOP
16,990.00 Accrued Expenses
65,519.32 33,373.84 Capital Stock
15,000.00 15,000.00 Retained Earning
764,688.78 837,579.98 Total Liabilities
$865,350.59 $953,583.14 *340 Sometime during October or November 1976, Harvey decided to sell all of his stock in petitioner and Provision. He began negotiating for the sale of the stock with Paul W. Thielking, A. P. W. Thielking and his son, Nick. On September 16, 1977, Harvey accepted an offer from the Thielkings to purchase 66.67 percent of his outstanding stock in petitioner and 66.67 percent of his stock in Provision for the total purchase price of $1,033,333.33, payable over several years subject to the terms and conditions of the purchase agreement. That agreement provided that at closing the Thielkings would deliver a check in the amount of $299,666.67 to Harvey, and that they would also deliver to Harvey six $122,277.78 promissory notes each maturing on the first day of November in consecutive years commencing in 1978. On September 30, 1977, Harvey accepted an offer from Nick to purchase the remaining 33.33 percent of his stock in petitioner and the remaining 33.33 percent of his stock in Provision for a total purchase price of $516,666.67. The purchase agreement similarly provided that at closing Nick would deliver a check in the amount of $149,833.33 and that he would also deliver to Harvey six *341 $61,138.89 promissory notes each maturing on the first day of November in consecutive years commencing in 1978. On October 3, 1977, at a special meeting of the boards of directors of petitioner and Provision, an agreement of merger between the two corporations was approved. The merger became effective on November 1, 1977. (Hereinafter for the period after November 1, 1977, a reference to petitioner is a reference to the merged corporations of petitioner and Provision.) On October 25, 1977, Nick assigned his rights and obligations under his agreement to purchase Harvey's stock to R & N.On November 1, 1977, Paul W. Thielking assigned his rights under the purchase agreement with Harvey to his wholly owned corporation, Paul W. Thielking, O.D., P.C. (hereinafter Thielking P.C.). On that same day, A. P. W. Thielking assigned his rights and obligations under the purchase agreement with Harvey to Lakewood Marine, Ltd., a corporation of which he had constructive ownership. On November 1, 1977, Harvey sold all his stock in petitioner and Provision to Thielking P.C., Lakewood Marine, Ltd., and R & N in accordance with the purchase agreements entered into with the Thielkings and Nick, *342 on September 16, 1977 and September 30, 1977, respectively (these agreements are collectively referred to as the September stock agreements). In order to finance the down payment for the purchase of Harvey's stock, the Thielkings obtained a loan in the amount of $299,666.67 from the Brenton National Bank of South Des Moines (hereinafter the Brenton Bank). The loan agreement, executed on October 31, 1977, required that the Thielkings cause petitioner to maintain an excess of current assets over current liabilities of not less than $400,000. The next day, on November 1, in october to finance the down payment to Harvey on the stock purchase, R & N obtained a loan in the amount of $149,833.33 from petitioner. During its fiscal year ending October 31, 1978, petitioner paid $76,656.24 to the Brenton Bank as payment on the Thielkings' loan. During its fiscal year ending October 31, 1979, petitioner paid the following amounts to meet its shareholders' obligations under the September stock agreements made with Harvey: $192,859.86 to Harvey as payment on the stock purchased by Thielking P.C., and Lakewood Marine, Ltd.; $85,000 to the Brenton Bank as payment on the Thielkings' loan; and *343 $96,429.95 to Harvey as payment on the stock purchased by R & N. During its fiscal year ending October 30, 1980, petitioner paid the following amounts to meet its shareholders' obligations under the September stock agreements with Harvey: $221,322.78 to Harvey for the stock purchased by Thielking P.C., and Lakewood Marine, Ltd., $85,000 to the Brenton Bank in payment of the Thielkings' loan; and $88,651.39 to Harvey for the stock purchased by R & N. All the above-mentioned amounts were recorded as loans to the respective shareholders on petitioner's books and records. By its fiscal year ending October 31, 1981, petitioner had distributed all of its retained or accumulated earnings to its shareholders. In the notice of deficiency, respondent determined that during each year in issue petitioner had been availed of for the purpose of avoiding Federal income taxes on its shareholders by allowing earnings and profits to accumulate beyond the reasonable needs of the business. Respondent calculated petitioner's retained current earnings and profits, reasonable business needs, and accumulated taxable income for each of the years in issue in the following amounts: Fiscal Year Ending
4/30/77
10/31/77
Retained Earnings and Profits
$675,580.39
$783.506.76
Current Retention for Reasonable
Needs of the Business
438,370.84
445,192.14
Accumulated Taxable Income
110,137.83
72,078.76
*344 On October 7, 1981, petitioner timely submitted to respondent a statement of the grounds on which petitioner relied to justify accumulation of its earnings and profits for each year in issue. On October 20, 1982, this Court, granting respondent's motion, held that petitioner's statement pursuant to section 534(c) is insufficient to shift the burden of proof to respondent. Accordingly, the burden of proof is on petitioner to show that its earnings and profits were not permitted to accumulate beyond the reasonable needs of its business. OPINION The sole issue for decision is whether petitioner was availed of for the purpose of avoiding income tax with respect to its controlling shareholder, Harvey, by permitting its earnings and profits to accumulate in excess of its reasonable business needs. Petitioner argues that its business needs required the accumulation of the earnings and that, in any event, it was not availed of for the prohibited purpose of avoiding income tax. Respondent, on the other hand, contends that petitioner permitted its earnings and profits to accumulate beyond its reasonable business needs in the respective amounts of $110,137.83 and $72,078.76 during petitioner's *345 fiscal years ending April 30, 1977, and October 31, 1977. With certain exceptions not relevant herein, section 531 imposes the accumulated earnings tax on the "accumulated taxable income" of every corporation that is formed or availed of for the purpose of avoiding income tax with respect to its shareholders. Secs. 531, 532. In general, "accumulated taxable income" is taxable income with certain adjustments, less earnings and profits retained for the reasonable needs of the business. Sec. 535. The fact that the earnings of a corporation are accumulated beyond the reasonable needs of the business is determinative of the prohibited purpose unless the corporation, by a preponderance of the evidence, proves to the contrary. Sec. 533. Thus, a determination of petitioner's reasonable business needs is critical to calculate its accumulated taxable income under section 535 and to decide whether the presumption of a tax avoidance purpose under section 533 applies. Thompson Engineering Co. v. Commissioner,80 T.C. 672, 693 (1983), on appeal (6th Cir., Nov. 14, 1983). *346 The determination of the reasonable needs of a business is a factual question to be answered in light of all the surrounding facts and circumstances. Thompson Engineering Co. v. Commissioner,supra at 693; Faber Cement Block Co. v. Commissioner,50 T.C. 317, 329 (1968); W.L. Meade, Inc. v. Commissioner,T.C. Memo. 1975-215, affd. 551 F. 2d 121 (6th Cir. 1977). The reasonable needs of a business include its reasonably anticipated needs. Sec. 537(a)(1). Such anticipated needs must be evidenced by a plan which is "specific, definite, and feasible" rather than "uncertain or vague." Sec. 1.537-1(b)(1), Income Tax Regs.While we are reluctant to substitute our business judgment for that of the corporate management, we will do so when, after examining all the facts and circumstances, we are convinced that the taxpayer's justification for the accumulation is an after-thought and that the accumulations were motivated by a tax avoidance purpose. See W.L. Meade, Inc. v. Commissioner,supra.
In the instant case, petitioner *347 had accumulated earnings of $764,688.78 by the end of its April 30, 1977 fiscal year, and $837,579.98 by the end of its October 31, 1977 fiscal year. In support of its position that these amounts were accumulated for the reasonable needs of the business, petitioner advances the following three arguments: (1) The agreement entered into by and between its majority shareholder, Harvey and his former wife, Julia Feilen (Julia), made Julia a dissenting shareholder; (2) the Bardahl formula [5] which respondent used to calculate petitioner's working capital needs is antiquated and inadequate; and (3) petitioner's business was growing and required additional capital for expansion. *348 Petitioner's first argument is wholly without merit. On brief, petitioner asserts that by reason of Julia's interest in Harvey's stock pursuant to the divorce [6] Julia became a dissenting shareholder in petitioner, and that it was necessary for petitioner to accumulate capital in order to buy-out her interest. There are two major fallacies in petitioner's argument. First, there is no evidence that Julia ever became a dissenting shareholder. She never directly owned any of petitioner's stock, her only interest in petitioner's stock was the right under the divorce decree to receive a percentage of the proceeds Harvey received if and when he sold stock in petitioner. In the agreement of December 1974, Julia and Harvey agreed to place a "dollar value" on whatever interest Julia had in the proceeds of Harvey's stock. Pursuant to the agreement Harvey placed a certain number of shares in escrow until the agreed value had been paid. As payments were made, the stock was released from escrow. At all relevant times, Harvey was record owner of the stock in escrow. Julia had no right to sell, vote, or receive dividends from the stock. Moreover, even if we *349 assume that Julia was a shareholder (which we are convinced she was not) her stock was not redeemed by petitioner, rather her putative stock interest was purchased by Harvey. While a redemption may qualify as a reasonable need, it must be principally motivated by business considerations of the corporation and not personal considerations of the individual shareholders. Pelton Steel Casting Co. v. Commissioner,28 T.C. 153 (1957), affd. 251 F. 2d 278 (7th Cir. 1958), cert. denied 356 U.S. 958 (1958).Quite simply we fail to see what business purpose is served by petitioner accumulating capital to enable its principal shareholder to satisfy a personal obligation arising out of a property settlement agreement with his former wife. Petitioner's second argument is that the Bardahl formula is antiquated and cannot accurately calculate its business needs. Petitioner further contends that if we apply the formula we must consider the needs of its sister corporation, Provision.We disagree with both positions. *350 The Bardahl formula is an attempt by this Court to inject a degree of objectivity into the quantification of a business's needs. We have held that the Bardahl formula is not mandatory in all situations such as where business lacks a routine operating cycle. Thompson Engineering Co. v. Commissioner,supra at 697, 698. However this is not to say that we have abandoned the use of the Bardahl formula. As we stated in Thompson, "it is a tool to be used when helpful." (80 T.C. at 697.) We will continue to utilize the Bardahl formula in calculating the working capital needs of a business where the business has a routine operating cycle. In the instant case, petitioner does not dispute that it has a routine operating cycle. Accordingly, we will calculate the amount of operating capital needed by petitioner using the Bardahl formula as a guide. [7]
*351 In computing petitioner's working capital needs by application of the Bardahl formula, petitioner also argues that we must use the combined figures of petitioner and Provision because both corporations were operated as one business. Petitioner and Provision are brother-sister corporations under the common control of Harvey. Generally, accumulations made in order to satisfy the business needs of a brother or sister corporation are not considered as accumulated to meet reasonable business needs. Chancy & Hope, Inc. v. Commissioner,80 T.C. 263, 283 (1983), and cases cited therein. As we stated in Chaney:
The fact that the two corporations are owned and effectively controlled by the same individuals does not justify accumulation of earnings by one corporation in order to meet the needs of a sister corporation. To allow accumulations to be made for the needs of a sister corporation would frustrate the major purpose of the accumulated earnings tax, which is to force earnings *352 out of a corporation to its individual shareholders so that they can be taxed a second time at graduated individual income tax rates. [80 T.C. at 283.] In the instant case, we are convinced that the business of Provision is not the business of petitioner. Harvey operated Provision and petitioner as two separate corporations; each corporation maintained separate books and records, separate checking accounts, separate payroll accounts, and separate accounts receivable and accounts payable. In addition, prior to October 31, 1977, petitioner's fiscal year ended April 30, while Provision's fiscal year ended October 31. Most significantly, however, Provision elected to be treated as a Subchapter S corporation under sections 1371, et seq. As a Subchapter S corporation, any earnings were taxable to its sole shareholder, Harvey, regardless of whether distributed or not. Sec. 1373. Thus, the accumulation of earnings by petitioner for the needs of Provision served no business purpose of petitioner; rather it was a method of accumulating earnings to avoid the imposition of individual income tax to Harvey, petitioner's major shareholder. To permit such an accumulation would *353 certainly frustrate the major purpose of the accumulated earnings tax. Accordingly, we hold that the needs of petitioner's sister corporation may not be considered in determining the operating capital needs of petitioner. See Chaney & Hope, Inc. v. Commissioner,supra at 288-290. In accordance with our conclusions herein, the following chart shows the amount of operating capital needed by petitioner for its operating cycle during its fiscal years ending April 30, 1977, and October 31, 1977, calculated according to the Bardahl formula: FY 4/30/77
FY 10/31/77
(365 days)
(183 days)
1. Net sales
$13,810,896.41
$ 7,760,292.96
2. Production cycle
a. Cost of goods sold
13,001,295.48
6.838,036.94
b. Average inventory
12,795.63
13,517.59
c. Material turnover (2a / b)
1,016.07
505.86
d. Day in production cycle
(days in year / 2c)
.3592
.3618
e. Production cycle as a percent
of year (2d / days in year)
.00098
.0020
3. Collection cycle
a.Average accounts receivable
447,408.43
499,922.83
b. Turnover rate (1 / 3a)
30.87
15.52
c. Day in account received cycle
(days in year / 3b)
11.82
11.79
d. Accounts receivable as a percent
of year (3c / days in year)
.0324
.0644
4. Yearly expenses (cost of goods sold
and net operating expenses)
13,679,042.26
7,676,410.71
5. Credit cycle
a. Average credit period
7 days
7 days
b. Credit cycle as percent of
year (5a / days in year)
.0192
.0383
6. Average length of operational
cycle (2e + 3d - 5b)
.01418
.0281
7. Operating needs
6 X 4
193,968.82
215,707.14
*354 Petitioner's final argument is that it needed to accumulate additional capital for expansion. In support of its position, petitioner points to the fact that since 1965 its business experienced substantial expansion that was financed entirely by retained earnings. Petitioner's pre-tax net earnings increased from $22,923.67 for its fiscal year ending April 30, 1965, to $189,063.17 for its fiscal year ending April 30, 1977. Moreover, petitioner accumulated total assets of $953,583.14 by its fiscal year ending October 31, 1977. Respondent, on the other hand, maintains that petitioner lacked any specific plans for expansion and that while petitioner's balance sheet shows total assets of $953,583.14, its fixed assets less depreciation was only $64,329.17. Thus, respondent points out that most of petitioner's assets consisted of retained earnings. The evidence shows that during the years in issue petitioner anticipated replacing trucks and other equipment at sometime in the future. Petitioner, however, failed to produce any evidence on the anticipated cost or expected replacement date. Moreover, petitioner's fixed assets, including trucks and other equipment, totaled less than $65,000. *355 While we agree that petitioner's business did in fact experience growth, petitioner lacked a specific plan to expand in the future. Upon considering all the relevant facts and circumstances, we believe that petitioner had a reasonable need to accumulate some additional earnings each year for anticipated replacement of equipment and expansion.In our best judgment, we find it is reasonable for petitioner to accumulate 10 percent of its operating capital needs for the above-mentioned purposes. Therefore, petitioner may accumulate an additional $19,396.88 and $21,570.71 for its fiscal years ending April 30, 1977 and October 31, 1977, respectively. During its fiscal years ending April 30, 1977 and October 31, 1977, petitioner had retained earnings in the amounts of $764,688.78 and $837,579.98, respectively, while it had reasonable business needs of $213,365.70 and $237,277.85 for each respective year. [8] Thus, petitioner's working capital was in excess of its business needs in the amount of $551,323.08 for its April 30, 1977 fiscal year and $600,302.13 for its October 31, 1977 fiscal year. *356 An accumulation beyond the reasonable needs of the business is determinative of the purpose to avoid Federal income tax with respect to its shareholders unless petitioner, by a preponderance of the evidence, proves to the contrary. Sec. 533(a). Petitioner's argument that its excessive accumulations were prompted by reasons other than tax avoidance are unconvincing. Petitioner contends that its failure to distribute accumulated earnings was due to its belief that it was precluded from doing so because of the loan agreement with the Brenton Bank and Harvey's agreement with his former wife, both of which required preservation of petitioner's assets. However, when we strip away all the talk, dig out the hard facts, and apply cold logic to them, we are convinced that petitioner's failure to distribute its earning was to avoid the imposition of tax upon its principal shareholder, Harvey. Throughout its history, petitioner paid negligible dividends even though it had sufficient cash reserves and was generally a successful corporation. There is no doubt that petitioner saved taxes for Harvey *357 by not paying dividends to him during the years in issue. Harvey's marginal tax rate for 1976 and 1977 was 70 percent whereas the marginal rate of petitioner for the years in issue was 48 percent. Moreover, by at least November 1976, Harvey decided to sell all of his stock in petitioner and Provision.If petitioner had distributed the full amount of its accumulated earnings prior to the sale of Harvey's stock, Harvey would have paid tax at the rate of 70 percent on the full amount of the distribution, and would have received a commensurately lower price for his stock because of the resulting decrease in petitioner's net worth. By keeping the accumulated earnings in petitioner, and then selling his stock, Harvey sought to get the earnings out of petitioner at the preferential capital gain rate. This is evidenced by the fact that petitioner used its accumulated earnings to finance the sale of Harvey's stock by making substantial loans to the purchasing shareholder. Finally, we note that there was no testimony by Harvey, petitioner's president and majority shareholder, to rebut the logical and reasonable inference of the intent to avoid tax. *358 We can infer from his failure to testify that his testimony would be adverse to petitioner's contentions. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F. 2d 513 (10th Cir. 1947).Therefore, we hold that petitioner is liable for the tax imposed under section 531. We note that our calculation of the amount of earnings that petitioner may accumulate for its reasonable business needs is less generous than allowed by respondent in the statutory notice of deficiency. However, respondent did not amend his answer to assert a claim for an increased deficiency. See sec. 6214(a). Consequently, for purposes of calculating petitioner's accumulated earnings tax, petitioner is entitled to retained earnings in the amount allowed by respondent in the notice of deficiency. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. On October 31, 1977, petitioner changed from a fiscal year ending April 30 to a fiscal year ending October 31. Accordingly, petitioner filed a tax return for its short taxable year extending from May 1, 1977 to October 31, 1977.↩
2. Harvey divorced his former wife, Julia Feilen (Julia) on April 10, 1964. The divorce decree provided, in part, that Julia was entitled to 50 percent and 35 percent, respectively, of the proceeds Harvey received from the sale of his stock in petitioner and its sister corporation, Harvey Feilen Provision Co. Since no sale was forthcoming, on December 23, 1974, Harvey and Julia executed an "Agreement for Reimbursement for Capital Stock and Escrow of the Same" (hereinafter the agreement). Generally, the agreement permitted Harvey to purchase Julia's right to the proceeds for an agreed value. Pursuant to the agreement Harvey placed a specific amount of stock into escrow which was to be released at the rate of one share for each month's payment to Julia. If Harvey paid on schedule, all amounts due would be paid and all stock would be released from escrow by December 1, 1979. Subsequently, a court order was issued which provided that upon completion of the payments Harvey would be discharged from further obligation under the original divorce decree. On December 1, 1979, Harvey completed the payments under the agreement and, on December 4, 1979, a release of judgment was entered.↩
3. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. The Subchapter S Revision Act of 1982, Pub. L. No. 97-354, 96 Stat. 1669 (1982), significantly altered the rules applicable to electing small business corporations for tax years beginning after 1982.↩
4. Petitioner's average trade accounts excludes accounts payable to Provision.↩
5. The Bardahl formula was derived from Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200, and Bardahl International Corp. v. Commissioner,T.C. Memo. 1966-182↩. This formula measures the amount of working capital needed for one operating cycle."This cycle may be described as the time needed to convert cash into raw materials, raw materials into finished goods, inventory into sales and accounts receivable, and any accounts receivable into cash." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.03 at 8-19 (4th ed. 1979).
6. See n. 2, supra.↩
7. Petitioner asserts that during an operating cycle there are periods when the cash requirements exceeds the average. However, petitioner has failed to produce evidence demonstrating that it had peak periods during the years in issue which required a greater amount of capital than allowed by the Bardahl formula. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.↩
8. Petitioner's reasonable business needs includes capital required for its operating needs and additional capital retained for anticipated expansion.↩